Filed in Dakota District Court
*** EFILED ***
Case Number: D70CI200000278
Transaction ID: 0012319152
Filing Date: 12/15/2020 02:35:01 PM CST

## IN THE DISTRICT COURT OF DAKOTA COUNTY, NEBRASKA

| | |
|---|---|
| SOUTH SIOUX CITY, NEBRASKA, | CASE NO.: _____ |
| Plaintiff, | |
| v. | |
| BIG OX ENERGY-SIOUXLAND, LLC, BIG OX ENERGY, INC., 2014 ACQUISITIONS 10 LLC, WELLS FARGO TRUST COMPANY, N.A., FEDERATED MUTUAL INSURANCE COMPANY, FEDERATED LIFE INSURANCE COMPANY, FEDERATED SERVICE INSURANCE COMPANY, ASSURITY LIFE INSURANCE COMPANY, CATHOLIC ORDER OF FORESTERS, NASSAU LIFE INSURANCE COMPANY, and PHL VARIABLE LIFE INSURANCE COMPANY, | **COMPLAINT** |
| Defendants. | |

Plaintiff, South Sioux City, Nebraska, brings its complaint against Defendants, Big Ox Energy-Siouxland, LLC, Big Ox Energy, Inc., 2014 Acquisitions 10 LLC, Wells Fargo Trust Company, N.A., Federated Mutual Insurance Company, Federated Life Insurance Company, Federated Service Insurance Company, Assurity Life Insurance Company, Catholic Order of Foresters, Nassau Life Insurance Company, and PHL Variable Life Insurance, and states as follows:

### PRELIMINARY STATEMENT

The City brings its complaint for misrepresentation, breach of contract, and declaratory judgment to address the many issues that arise from the refusal of Big Ox Energy-Siouxland, LLC's and Big Ox Energy, Inc. to accept the City's wastewater at their facility in South Sioux City, Nebraska. These defendants contractually agreed to

EXHIBIT B

accept the City's wastewater but have failed to operate their waste-to-energy wastewater treatment facility in compliance with their permit or environmental laws and eventually shut the facility down. Despite the City not being able to send its wastewater to the Big Ox facility, Wells Fargo and the various insurance companies/lenders that Wells Fargo claims to represent still demand that the City make payments as if the facility was still operating, even though the City must now send its untreated wastewater to another third party. The position of the defendants is inequitable, unreasonable, and unenforceable. Accordingly, the City seeks to rescind the arrangement and, alternatively, the Court's intervention to require Big Ox Energy-Siouxland, LLC and Big Ox Energy, Inc. to perform their obligations and accept the City's wastewater and to determine, among other things, that the City is not required to make payments to the facility's operator, Wells Fargo, the facility's lenders, or any other party for time periods during which the City cannot send its wastewater to that facility.

## **PARTIES**

1.    Plaintiff South Sioux City, Nebraska is a Nebraska municipality classified as a city of the first class.

2.    Defendant Big Ox Energy-Siouxland, LLC is a Wisconsin limited liability company with its principal place of business in Denmark, Wisconsin.

3.    Defendant Big Ox Energy, Inc. is a Delaware corporation with its principal place of business in Denmark, Wisconsin.

4.    Defendant 2014 Acquisitions 10 LLC is a Delaware limited liability company with its principal place of business in Nashua, New Hampshire.

5.      Defendant Wells Fargo Trust Company, N.A. f/k/a Wells Fargo Bank Northwest, N.A. ("Wells Fargo") is a national banking association with its principal place of business in Ogden, Utah.

6.      Defendant Federated Mutual Insurance Company is a Minnesota insurance company with a principal place of business in Owatonna, Minnesota.

7.      Defendant Federated Life Insurance Company is a Minnesota insurance company with a principal place of business in Owatonna, Minnesota.

8.      Defendant Federated Service Insurance Company is a Minnesota insurance company with a principal place of business in Owatonna, Minnesota.

9.      Defendant Assurity Life Insurance Company is a Nebraska insurance company with a principal place of business in Lincoln, Nebraska.

10.     Defendant Catholic Order of Foresters is a fraternal benefit society chartered in Illinois with a principal place of business in Naperville, Illinois.

11.     Defendant Nassau Life Insurance Company f/k/a Phoenix Life Insurance Company is a New York insurance company with a principal place of business in Hartford, Connecticut.

12.     Defendant PHL Variable Life Insurance Company is a Connecticut insurance company with a principal place of business in Hartford, Connecticut.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this matter pursuant to Neb. Rev. Stat. §§ 16-727, 25-21,149, and 24-302.

14.     Venue is proper in this Court pursuant to Neb. Rev. Stat. § 25-403.01.

3

## FACTS

I. **The Big Ox Operators and Other Entities Agreed to Construct a Wastewater Treatment Facility and Accept the City's Wastewater.**

15.     In about 2012, the City was approached by representatives of Big Ox Energy[1] with a proposal to construct a facility in South Sioux City, Nebraska that would process the City's wastewater and biomass and generate natural gas through anaerobic processes (the "Facility").

16.     At the time, the City was open to Big Ox's proposal, which Big Ox claimed would reduce the cost to treat the City's wastewater.

17.     The Big Ox Operators represented that they would be able to meet the City's needs and it would be able to do so with a facility that acted as a renewable energy source.

18.     The City believed that the Facility would meet the City's need to dispose of wastewater and biomass generated in the City, and that the Facility would also provide a source of renewable energy.

19.     Based on representations of the Big Ox Operators that they had sufficient experience, expertise, and resources to construct, operate, and maintain the Facility, the City entered into a contract with Big Ox Energy, Inc., and 2014 Acquisitions 10 LLC (the "Tipping Agreement").

20.     The effective date of the Tipping Agreement was March 24, 2014.

21.     At the request of Big Ox Energy, and before the Facility was constructed and the Big Ox Operators began operation of the Facility, Big Ox Energy Inc., 2014

---

[1] The City understands that Defendants Big Ox Energy, Inc. and Big Ox Energy-Siouxland, LLC are, or at the time were, related entities and that the same representatives acted on behalf of all entities under the business name Big Ox Energy. For the sake of clarity, they are collectively referred to as the "Big Ox Operators."

Acquisitions 10 LLC, and the City agreed to an Amended and Restated Tipping Agreement dated September 22, 2014.

## II.  The Terms of the Amended and Restated Tipping Agreement

22.     Big Ox Energy, Inc., agreed, as Operator of the Facility, that it would accept the City's wastewater once the Facility opened.

23.     Big Ox Energy, Inc. represented and warranted that it was able to perform all of its obligations under the Amended and Restated Tipping Agreement.

24.     Big Ox Energy, Inc. agreed that it would operate the Facility in accordance with "all applicable Laws including applicable Laws of the U.S. Environmental Protection Agency, Nebraska Division [sic] of Environmental Quality and the Iowa Department of Natural Resources."

25.     The City agreed that it would construct interconnection and transmission facilities that would bring the City's wastewater to the Facility.

26.     The City agreed that it would pay Big Ox Energy, Inc. in exchange for Big Ox Energy, Inc. accepting the City's wastewater at the Facility.

27.     The Amended and Restated Tipping Agreement recognizes that other parties had an interest in the Facility, and in performance of the Amended and Restated Tipping Agreement.

28.     First, the Amended and Restated Tipping Agreement specifically defines and refers throughout to "Lenders" that are "lenders, noteholders, bondholders, and each other party which has provided financing, credit, indebtedness or a commitment therefor pursuant to any Financing Agreement."

29.     Defendants Federated Mutual Insurance Company Federated Life Insurance Company, Federated Service Insurance Company, Assurity Life Insurance

Company, Catholic Order of Foresters, Nassau Life Insurance Company f/k/a Phoenix Life Insurance Company, and PHL Variable Life Insurance Company (collectively "Lenders")  are "Lenders" as defined in the Amended and Restated Tipping Agreement.

30.    Second, the Amended and Restated Tipping Agreement specifically defines and refers to a "Lender Agent" that may be an administrative agent that acts on behalf of the Lenders.

31.    Defendant Wells Fargo is the "Lender Agent" as defined in the Amended and Restated Tipping Agreement.

32.    Third, the Amended and Restated Tipping Agreement: (1) requires Lenders' consent before Big Ox Energy, Inc. could terminate the agreement; (2) requires that the Lender Agent and Lenders receive default notices; (3) requires Lenders' consent before the City can replace Big Ox Energy, Inc. as Operator of the Facility; (4) allows Lenders to cure Big Ox Energy's defaults; and (5) recognizes "[t]his Agreement is intended solely for the benefit of the Parties hereto … except for rights expressly granted to Lenders" and "this Agreement shall not confer any right of suit or action whatsoever on any Person not a Party except for the rights granted to the Lenders."

### III. Big Ox Energy Assigns Rights to Lenders and Wells Fargo

33.    After the City, Big Ox Energy, Inc., and 2014 Acquisitions 10 LLC entered into the Amended and Restated Tipping Agreement, those parties, along with Big Ox Energy-Siouxland, LLC and Wells Fargo entered in a Consent to Assignment and Agreement (the "Consent to Assignment") dated February 10, 2015.

34.     Like the Amended and Restated Tipping Agreement, the Consent to Assignment refers to and gives rights to the Lenders, this time referring to them as "Purchasers."

35.     For example, Section 6.9 of the Consent to Assignment states that "This Consent shall be for the sole benefit of the parties hereto and the Purchasers…."

## IV. The Big Ox Operators Breach the Amended and Restated Tipping Agreement and Abandon the Facility.

36.     The Facility opened in September 2016 and the Big Ox Operators began performing under the Amended and Restated Tipping Agreement by accepting the City's wastewater.

37.     However, issues began to arise at the Facility almost immediately.

38.     In October 2016, the Big Ox Operators stopped accepting certain wastewater after they received complaints from neighboring property owners about odors generated by the Facility.

39.     In December 2016, a Big Ox Operator employee drilled a hole in one of the Facility's anaerobic digesters, causing injury to the employee and causing a release of biogas, methane, and/or hydrogen sulfide.

40.     In early 2017, Big Ox Operator representatives refused to allow environmental inspectors access to the Facility to perform inspections.

41.     When inspectors eventually obtained access to the Facility, they observed numerous violations, which led to the entry of a Consent Agreement between Big Ox Energy Siouxland, LLC[2] and the U.S. Environmental Protection Agency.

---

[2] The Amended and Restated Tipping Agreement defines Big Ox Energy, Inc. as the Operator, but the Consent to Assignment defines Big Ox Energy Siouxland, LLC as the Operator. As such, it is unclear which of these entities was actually performing duties as Operator during the relevant times.

42.     That Consent Agreement alleged that Big Ox Energy Siouxland, LLC violated provisions of the Clean Air Act and required Big Ox Energy Siouxland, LLC to pay a monetary fine.

43.     In addition to this Consent Agreement, Big Ox Energy Siouxland, LLC also entered into Consent Orders with the Nebraska Department of Environmental Quality ("NDEQ") (now Nebraska Department of Environment and Energy) on June 23, 2017 and July 30, 2018.

44.     The EPA also issued five Notices of Violation ("NOV") to Big Ox Energy Siouxland, LLC in 2018 and 2019.

45.     The EPA issued additional notices and warnings to Big Ox Energy Siouxland, LLC in 2017, 2018, and 2019, as did the City of Sioux City, Iowa, which received wastewater that Big Ox Energy Siouxland, LLC should have properly treated.

46.     NDEQ found that Big Ox Energy Siouxland, LLC violated its permits on at least thirty-three (33) different occasions throughout 2017, 2018, and 2019.

47.     Big Ox Energy Siouxland, LLC was unwilling or unable to cure these numerous violations and operate the Facility in accordance with its permit and applicable state and federal law.

48.     Big Ox Energy Siouxland, LLC stopped operating the Facility in early 2019, has not operated the Facility since then, and upon information and belief, has not maintained the Facility in an operational condition.

49.     Since early 2019, the City has been unable to send its wastewater to the Facility as it bargained for in the Amended and Restated Tipping Agreement, which has increased wastewater treatment processing costs for the City's customers and led to the

City providing the Big Ox Operators notice of default under the Amended and Restated Tipping Agreement in early 2019.

50.     Finally, in January 2020, the Nebraska Department of Environment and Energy revoked Big Ox Energy Siouxland, LLC's permits, meaning that Big Ox Energy Siouxland, LLC has lost its legal authority to operate the Facility.

51.     To the City's knowledge, neither Big Ox Energy Siouxland, LLC, nor any of the Big Ox Operators have made any attempt to correct the numerous conditions that caused the Facility to violate its permit or have they taken any steps to have permits for the Facility restored.

52.     To the City's knowledge, neither Wells Fargo nor the Lenders have made any attempt to correct the numerous conditions that caused the Facility to violate its permit or have they taken any steps to have permits for the Facility restored.

53.     To the City's knowledge, neither Wells Fargo nor the Lenders have made any attempt to force any of the Big Ox Operators to clean up the Facility, restore the permits, or resume operations of the Facility.

54.     The City believes that Big Ox Energy Siouxland LLC and Big Ox Energy, Inc. have effectively abandoned the Facility and are willfully disregarding their obligations under the Amended and Restated Tipping Agreement.

**V. Wells Fargo Seeks Payments Under the Amended and Restated Tipping Agreement Even Though the Facility is Not Operating.**

55.     On July 15, 2020, more than a year after the Big Ox Operators stopped accepting the City's wastewater, Wells Fargo, purportedly acting on behalf of the Lenders, sent a notice of claim to the City Clerk demanding more than $3 million in

payments that Wells Fargo claimed the City owed under the Amended and Restated Tipping Agreement and the Consent to Assignment.

56.    Wells Fargo's July 15, 2020 notice of claim stated that the claim was being submitted pursuant to Neb. Rev. Stat. § 16-726.

57.    The City Council placed Wells Fargo's claim on its October 12, 2020 council meeting agenda and allowed Wells Fargo to present evidence at that meeting.

58.    After considering Wells Fargo's claim, the City Council issued a written decision denying Wells Fargo's claim on October 26, 2020 (the "Decision"). A copy of that decision is attached as Exhibit A.

59.    The Decision states that the City denied part of Wells Fargo's claim because most of Wells Fargo's claim sought payment for claims that accrued more than ninety (90) days after the claim accrued, which failed to comply with Neb. Rev. Stat. § 16-726.

60.    The Decision further states that the City also denied Wells Fargo's claim because the Big Ox Operators' refusal to accept the City's wastewater and their other breaches of the Amended and Restated Tipping Agreement relieved the City of its obligation to continue making payments under the Amended and Restated Tipping Agreement and the Consent to Assignment.

61.    The Decision further states that the City does not have an unconditional payment obligation as Wells Fargo may argue, because the "hell or high water" clauses in the relevant agreements are not enforceable against the City.

62.    The Decision further states that the City is not obligated to make payments to Wells Fargo even if the "hell or high water" clauses were enforceable

against the City because the Consent to Assignment would violate Art. XIII § 3 of the Nebraska Constitution.

63.     Nebraska law establishes the appeal procedure for any appeal of a City's denial of a claim submitted pursuant to Neb. Rev. Stat. § 16-726.

64.     Neb. Rev. Stat. § 16-727 states that a party may appeal "from the decision of the city council to the district court of the same county by causing a written notice to be served on the city clerk within twenty days after making such decision."

65.     More than twenty days have elapsed since the City disallowed Wells Fargo's July 15, 2020 claim in the Decision.

66.     Wells Fargo did not serve a written notice of appeal on the City Clerk within twenty days after the City (a) issued its Decision and (b) sent a copy of that Decision to Wells Fargo and its counsel.

## COUNT ONE – NEGLIGENT MISREPRESENTATION

67.     The City reincorporates by reference the allegations set forth in the above paragraphs of its Complaint.

68.     When representatives of the Big Ox Operators approached the City concerning their proposal to construct and operate the Facility, they represented to the City that they had sufficient knowledge, expertise, and resources to construct and operate a waste-to-energy facility that could accept and process the City's wastewater over the next twenty years.

69.     In both the Tipping Agreement and the Amended and Restated Tipping Agreement, Big Ox Energy, Inc. represented and warranted that it could perform its obligations under those agreements, including accepting the City's wastewater

11

throughout the twenty-year duration of the agreements and to operate the Facility in compliance with all applicable state and federal environmental laws and regulations.

70.     The Big Ox Operators knew, or should have known, that they would not be able to perform their obligations under the Amended and Restated Tipping Agreement.

71.     The City relied on representations made by representatives of the Big Ox Operators to enter into the Tipping Agreement, the Amended and Restated Tipping Agreement, and the Consent to Assignment.

72.     Based on those representations, the City believed that the Big Ox Operators would be able to operate the Facility through the duration of the Amended and Restated Tipping Agreement and do so in compliance with all applicable state and federal environmental laws and regulations.

73.     The City would not have entered into the Tipping Agreement, the Amended and Restated Tipping Agreement, or the Consent to Assignment if it had known that the Big Ox Operators would operate the Facility in violation of numerous state and federal environmental laws and regulations, as well as applicable permits.

74.     The City would not have entered into the Tipping Agreement, the Amended and Restated Tipping Agreement, or the Consent to Assignment if it had known that the Big Ox Operators would cease operation of the Facility instead of addressing operational issues that arose.

75.     The City would not have entered into the Tipping Agreement, the Amended and Restated Tipping Agreement, or the Consent to Assignment if it had known that the Big Ox Operators would effectively abandon the Facility if problems arose.

76.     The Big Ox Operators misrepresented their ability to operate the Facility.

12

77.     The Big Ox Operators misrepresented their ability to operate the Facility in compliance with applicable state and federal environmental laws and regulations.

78.     The Big Ox Operators misrepresented their ability to perform their obligations under the Tipping Agreement and Amended and Restated Tipping Agreement.

79.     These misrepresentations caused the City to enter into the Tipping Agreement and Amended and Restated Tipping Agreement.

80.     The misrepresentations made to the City concerning the Big Ox Operators' ability to operate the Facility, to comply with applicable environmental laws and regulations, and to perform fully under the Tipping Agreement and Amended and Restated Tipping Agreement have damaged the City in that it did not receive the benefit of its bargain and, thus, justify rescission of the Amended and Restated Tipping Agreement and the Consent to Assignment.

## COUNT TWO – BREACH OF CONTRACT

81.     The City reincorporates by reference the allegations set forth in the above paragraphs of its Complaint.

82.     The Big Ox Operators entered into the Amended and Restated Tipping Agreement with the City.  Attached hereto as Exhibit B and incorporated herein is a true and correct copy of the Amended and Restated Tipping Agreement.

83.     Section 3.01 of the Amended and Restated Tipping Agreement provides that the Big Ox Operators will accept at least 3,000,000 gallons of the City's wastewater per day.

84.     Section 11.01(b) of the Amended and Restated Tipping Agreement provides that "[t]he Operator shall operate the Facility in accordance with all applicable

Laws including applicable Laws of the U.S. Environmental Protection Agency, Nebraska Division of Environmental Quality and the Iowa Department of Natural Resources."

85.     The Big Ox Operators have stopped accepting the City's wastewater since early 2019.

86.     The Big Ox Operators have been cited dozens of times for violation of the Facility's permits and/or state and federal environmental laws.

87.     The Big Ox Operators have breached the Amended and Restated Tipping Agreement by refusing to accept the City's wastewater.

88.     The Big Ox Operators have breached the Amended and Restated Tipping Agreement by failing to operate the Facility in compliance with all applicable laws.

89.     Breaches of the Amended and Restated Tipping Agreement by the Big Ox Operators have prevented the City from receiving the benefit of its bargain under the Amended and Restated Tipping Agreement and the only suitable remedy for these breaches is to require the Big Ox Operators to make all necessary repairs to the Facility, apply for and obtain applicable permits, and resume operations in compliance with all legal and contractual requirements.

## COUNT THREE – DECLARATORY JUDGMENT

90.     The City reincorporates by reference the allegations set forth in the above paragraphs of its Complaint.

91.     Controversies exist concerning the City's obligation under the Amended and Restated Tipping Agreement and the Consent to Assignment to continue making payments for months in which the Big Ox Operators are in breach of the Amended and Restated Tipping Agreement.

14

92.     The Decision denied Wells Fargo's claim against City in its entirety and determined that the City had no obligation to continue making payments under the Amended and Restated Tipping Agreement and the Consent to Assignment for any time period in which the Big Ox Operators refuse to accept the City's wastewater.

93.     Wells Fargo did not appeal the Decision.

94.     Wells Fargo and any Defendant for whom Wells Fargo claimed to act are bound by the Decision, which is a final judgment on the merits by an adjudicative body having jurisdiction over the matter and parties that was litigated and not appealed.

95.     None of these Defendants can pursue payment for claims against the City because under the doctrine of *res judicata*, the Decision bars Wells Fargo and those for which it claimed to act, from re-litigating the grounds upon which the Decision is based that are equally applicable to any new claim raised by Wells Fargo or those for which it claimed to act.

96.     Because Wells Fargo and any Defendant for whom Wells Fargo claimed to act are bound by the Decision, none of these Defendants can pursue payment for claims against the City that would have been due for any period in which the Big Ox Operators refuse to accept the City's wastewater or fail to operate the Facility in compliance with all applicable laws.

97.     The Decision also determined that $2,603,080.08 of Wells Fargo's claim against the City was time barred due to Wells Fargo's decision not to bring a claim pursuant to Neb. Rev. Stat. § 16-726 until July 15, 2020 – thus barring any claims that accrued or became due prior to April 15, 2020.

98.     Even if *res judicata* does not apply to any claims that Wells Fargo and any Defendant for whom Wells Fargo claimed to act may bring, all claims of these parties

that accrued or became due prior to April 15, 2020 are barred by the applicable statute of limitations.

99.     Since the Facility opened, the Big Ox Operators breached the Amended and Restated Tipping Agreement numerous times by failing to operate the Facility in compliance with all applicable laws.

100.    Since early 2019, the Big Ox Operators have been in continuous breach of the Amended and Restated Tipping Agreement by failing to accept the City's wastewater at the Facility.

101.    Wells Fargo and the Lenders have taken the position that they should receive payment from the City even though the City is not receiving what it bargained for in the Tipping Agreement and the Amended and Restated Tipping Agreement.

102.    Because the Big Ox Operators have materially breached the Amended and Restated Tipping Agreement and remain in breach of the Amended and Restated Tipping Agreement, the City is not required to make any payments under the Amended and Restated Tipping Agreement and the Consent to Assignment for any month in which the Big Ox Operators were in breach of the Amended and Restated Tipping Agreement.

103.    The Amended and Restated Tipping Agreement and Consent to Assignment contain multiple clauses that purport to require the City to make payments under the Amended and Restated Tipping Agreement even if the Facility's operator refuses to accept the City's wastewater, materially breaches its obligations, fails to operate the Facility in compliance with all applicable laws, willfully violates permits for the Facility, or even completely abandons the Facility.

104.    The City submits that these obligations are unenforceable for the reasons set forth in the Decision.

105.    Specifically, these clauses in the Amended and Restated Tipping Agreement and Consent to Assignment – the "hell or high water" clauses – are unenforceable as a matter of public policy.

106.    Because these clauses are unenforceable against the City, the City is not obligated to make any payments under the Amended and Restated Tipping Agreement and Consent to Assignment for any month in which the Big Ox Operators are in breach of the Amended and Restated Tipping Agreement.

107.    The claimed unconditional payment obligations are also unenforceable because the Nebraska Constitution prohibits a municipality, such as the City, from giving or loaning its credit "in aid of any individual, association, or corporation."

108.    Wells Fargo and the Lenders claim that the City's payment obligation is unconditional.

109.    If the City's payment obligations were unconditional – meaning that the City must make payments to Wells Fargo and the Lenders even if the Big Ox Operators are in breach of the Amended and Restated Tipping Agreement by refusing to accept the City's wastewater and failing to operate the Facility in compliance with all applicable laws – then the City's payment obligation would constitute a guarantee of a private party's debt to the Lenders.

110.    Because the Nebraska Constitution prohibits the City from guaranteeing debts of private parties, such as the Big Ox Operators, then the Consent to Assignment would violate the Nebraska Constitution and those provisions of the Consent to Assignment would be unenforceable.

17

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, South Sioux City, Nebraska, requests entry of a judgment in its favor granting the following relief:

(1)     An Order rescinding the Amended and Restated Tipping Agreement and the Consent to Assignment due to misrepresentations made by Defendants that induced the City to enter into the Amended and Restated Tipping Agreement;

(2)     An Order finding the Big Ox Operators in breach of their obligations under the Amended and Restated Tipping Agreement and requiring the Big Ox Operators to immediately resume performance of all of their obligations under the Amended and Restated Tipping Agreement, including but not limited to immediately accepting the City's wastewater and biomass pursuant to the Amended and Restated Tipping Agreement and in compliance with all applicable laws and regulations;

(3)     An Order declaring that Wells Fargo's failure to comply with statutory appeal procedures set forth in Neb. Rev. Stat. § 16-727 operates as *res judicata* concerning all issues raised by Wells Fargo in its July 15, 2020 Notice of Claim and in the City's decision denying Wells Fargo's July 15, 2020 Notice of Claim;

(4)     An Order declaring that the City is not required to make any payments under the Amended and Restated Tipping Agreement and the Consent to Assignment for any month in which the Big Ox Operators are or were in breach of the Amended and Restated Tipping Agreement;

(5)     An Order declaring that any claim to payments under the Consent to Assignment or the Amended and Restated Tipping Agreement that was not served on the South Sioux City Clerk within ninety (90) days of the claim accruing or becoming due is barred by the statute of limitations set forth in Neb. Rev. Stat. § 16-726;

18

(6)     The City requests that the Court retain jurisdiction to ensure continued enforcement of the Big Ox Operators' obligation to operate the Facility pursuant to the Amended and Restated Tipping Agreement; and

(7)     Any other relief available at law or equity that the Court deems just and proper.

Dated: December 15, 2020

SOUTH SIOUX CITY, NEBRASKA,
Plaintiff,

By: /s/ Andrew S. Tugan
    Brian J. Koenig, #23807
    Andrew S. Tugan, #26917
    KOLEY JESSEN P.C., L.L.O.
    One Pacific Place, Suite 800
    1125 South 103rd Street
    Omaha, NE  68124-1079
    (402) 390-9500
    (402) 390-9005 (facsimile)
    brian.koenig@koleyjessen.com
    andrew.tugan@koleyjessen.com

    -and-

    Michael P. Schmiedt, NE#19597
    David C. Briese, NE#25425
    Crary, Huff, Ringgenberg, Hartnett &
    Storm, P.C.
    329 Pierce Street, Suite 200
    Sioux City, IA 51102
    (712) 277-4561
    (712) 277-4605 (facsimile)
    mschmiedt@craryhuff.com
    dbriese@craryhuff.com



October 26, 2020

<u>Via Certified and Regular U.S. Mail</u>

Wells Fargo Trust Company, N.A.
c/o Kim Chandler, Vice President
Corporate Trust Services
399 S. Main Street, 5th Floor
Salt Lake City, UT 84111

Federated Mutual Insurance Company
121 East Park Square
Owatonna, MN 55060

Big Ox Energy, Inc.
6601 County Road R
P.O. Box 396
Denmark, WI 54208

Federated Life Insurance Company
121 East Park Square
Owatonna, MN 55060

Big Ox Energy—Siouxland, LLC
6601 County Road R
P.O. Box 396
Denmark, WI 54208

Federated Service Insurance Company
121 East Park Square
Owatonna, MN 55060

2014 Acquisitions 10 LLC
10 Tara Blvd. Suite 501
Nashua, NH 03062

Assurity Life Insurance Company
c/o John A. Sharp, Registered Agent
P.O. Box 82533
Lincoln, NE 68501

Ciovis Energy, LLC
6601 County Road R
P.O. Box 396
Denmark, WI 54208

Catholic Order of Foresters
355 Shuman Boulevard
Naperville, IL 60563

Phillip M. J. Edison
Chapman and Cutler, LLP
111 W. Monroe
Chicago, IL 60603

Brian J. Brislen
Lamson Dugan & Murray LLP
10306 Regency Parkway Drive
Omaha, NE 68114

Re:   Denial of Wells Fargo's Claim Dated July 15, 2020 under Neb. Rev. Stat. § 16-726

All:

You are hereby notified the claim submitted by Wells Fargo Trust Company ("<u>Wells Fargo</u>") on July 15, 2020 (the "<u>Claim</u>") is denied. The City Council of South Sioux City, Nebraska (the "<u>Council</u>") received the information provided in Wells Fargo's July 15, 2020 Notice of Claim, as well as the additional letter submitted by Wells Fargo on October 9, 2020. The Council considered this matter during its October 12, 2020 meeting in which Mr. Brian Brislen was present on behalf of Wells Fargo as "Collateral Trustee." The Claim references the Amended and Restated Tipping Agreement dated September 22, 2014 (the "<u>Tipping Agreement</u>") entered into by and among the City, Bix Ox Energy, Inc. ("<u>Big Ox</u>"), and 2014 Acquisitions 10, LLC, a Consent to Assignment



City of South Sioux City, Nebraska
1615 First Avenue, South Sioux City, Nebraska 68776-2245
Phone: 402-494-7500   Fax: 402-494-7527   TTD: 402-494-7500 ext 339
www.southsiouxcity.org

**EXHIBIT A**

and Agreement dated February 10, 2015 (the "Consent to Assignment") entered into by and among the City, Big Ox, Big Ox Energy-Siouxland, LLC, 2014 Acquisitions 10, LLC, and Wells Fargo, and other documents referenced in your Claim. These documents, as well as all letter correspondence between the City and the parties to those agreements, shall be considered part of the record of this decision.

Wells Fargo brought the Claim pursuant to Neb. Rev. Stat. § 16-726, which states:

> All liquidated and unliquidated claims and accounts payable against a city of the first class shall: (1) Be presented in writing; (2) state the name and address of the claimant and the amount of the claim; and (3) fully and accurately identify the items or services for which payment is claimed or the time, place, nature, and circumstances giving rise to the claim.

The Council concurs with Wells Fargo that this statute applies to the Claim.

Neb. Rev. Stat. § 16-726 further states: "As a condition precedent to maintaining an action for a claim, other than a tort claim as defined in section 13-903, the claimant shall file such claim within ninety days of the accrual of the claim in the office of the city clerk." Neb. Rev. Stat. § 16-726.

Wells Fargo did not specify the date on which the Claim accrued; however, the Council understands that Wells Fargo bases its claim amount on the monthly payments that are contemplated in Article 9 the Tipping Agreement, which requires in Section 9.04 that the City shall pay "on or before the tenth day of each month with respect to the previous month…."

Under Neb. Rev. Stat. § 16-726, Wells Fargo was required to bring its Claim within ninety (90) days of when each of those payments would have been due, or accrued, to maintain a claim for the payment. As such, the amounts that Wells Fargo claims in connection with payments that would have been due, or accrued, before April 15, 2020 are barred by Neb. Rev. Stat. § 16-726. The Council understands the amount of the Claim that is time barred to be $2,603,080.80[1], which represents the amount of the Claim that became due prior to April 15, 2020.

Further, in reference to Wells Fargo's October 9, 2020 letter that purports to claim an additional $477,543.62 is owed to Wells Fargo, that correspondence does not comply with the statutory requirement that any notice of claim be filed "in the office of the city clerk."

Additionally, even if Wells Fargo had submitted its claim to the City Clerk timely under Neb. Rev. Stat. § 16-726, the Council still must deny the Claim in its entirety because it is undisputed that Big Ox, Bix Ox Energy-Siouxland, LLC, and 2014 Acquisition 10, LLC (collectively, the "Big Ox Affiliates"), the entities responsible for building and operating the wastewater treatment facility that is the subject of the Tipping Agreement, have been in breach of their obligations since at least March 2019, if not earlier, thereby excusing the City's performance. In March 2019, the City placed Big Ox Energy in default of the Tipping Agreement for failing to operate the wastewater

---

[1] This amount does not include any claim to interest that Wells Fargo may assert, which is referenced generally in the Claim but is not identified with specificity. To the extent that Wells Fargo contends that the Claim includes interest on payments that would have been due, or accrued, before April 15, 2020, the claim for that interest is also time barred.

**EXHIBIT A**

treatment facility in accordance with all contractual and legal requirements. Wells Fargo has not contested this default. After the Big Ox Affiliates breached their obligations under the Tipping Agreement, the City was excused from its performance and not required to continue making payments under the Tipping Agreement. *See Siouxland Ethanol, LLC v. Sebade Bros., LLC*, 290 Neb. 230, 236, 859 N.W.2d 586, 592 (2015). Because Wells Fargo's claimed right to payment arises out of the Tipping Agreement, Wells Fargo is not entitled to receive any payments after the Big Ox Affiliates breached the Tipping Agreement.

While Wells Fargo did not argue in its Claim or during the Council's October 12, 2020 meeting that the City must make payments despite the Big Ox Affiliates' failure to operate the wastewater treatment facility, the Council expects that Wells Fargo may raise this argument if it decides to appeal this decision. Accordingly, the Council addresses that argument and finds that despite the presence of certain provisions in the Tipping Agreement and Consent to Assignment, including Section 9.03 of the Tipping Agreement and Section 2.10(d) of the Consent to Assignment, referred to by Wells Fargo as the "hell or high water clauses," the City is not obligated to make payments to Wells Fargo after the date of Big Ox's default. The "hell or high water clauses" in these agreements on which Wells Fargo may rely are not universally enforceable. Indeed, these clauses, are typically unenforceable when a party does not receive what it bargains for. Here, the City has not received the services for which it bargained, so it is not required to continue making payments under the Tipping Agreement when the other parties refuse to perform their obligations.

If those "hell or high water" clauses were enforceable, then the Consent to Assignment would constitute a guaranty by the City of the Big Ox Affiliates' debt that would be unconstitutional. Under the Nebraska Constitution: "The credit of the state shall never be given or loaned in aid of any individual, association, or corporation . . . ." Neb. Const. Art. XIII, § 3. The City cannot effectually guarantee the Big Ox entities' debts. Doing so would violate this constitutional provision. To avoid a conflict with the Nebraska Constitution, the only reasonable way for the Council to consider the payment provisions of the Tipping Agreement and Consent to Assignment is for the City's payment obligations to be excused if the Big Ox Affiliates fundamentally fail to perform their obligation to provide wastewater treatment services to the City. Thus, because Big Ox has failed to fundamentally perform its obligations for more than a year and a half, the City's payment obligation has been excused. Accordingly, the Council will not authorize payment of Wells Fargo's claim for this period.

Pursuant to Neb. Rev. Stat. § 16-727, Wells Fargo may appeal the Council's disallowance of Wells Fargo's claim to the Dakota County District Court by taking the actions described in that statute.

Sincerely,

Nanci Walsh
City Clerk/Finance Director

**EXHIBIT A**

*city's Amended Tipping agreement copy 9/22/14*

**TIPPING AGREEMENT**

Dated as of March 24, 2014

Between

BIG OX ENERGY, INC., a  Delaware corporation,

SOUTH SIOUX CITY, a municipality

And

2014 ACQUISITIONS 10 LLC , a Delaware limited liability company

**EXHIBIT B**

**AMENDED AND RESTATED TIPPING AGREEMENT**, dated as of Sept. 22 2014 (this "Agreement"), amending and restating the Tipping Agreement, dated as of March 24, 2014, among BIG OX ENERGY, INC., a Delaware corporation (the "Operator"), SOUTH SIOUX CITY, a Nebraska municipality ( the "Municipality") and 2014 ACQUISITIONS 10 LLC , a Delaware limited liability company ("Owner").

## RECITALS

**WHEREAS** the Operator intends to construct and develop an anaerobic renewable natural gas facility which will process wastewater and biomass (the Site and all existing improvements and all improvements hereinafter constructed or made on or to the Site, together with all equipment associated with such facility, are collectively referred to herein as the "Facility");

**WHEREAS** Owner will own the Facility and lease the Facility to the Operator pursuant to a Lease Agreement between the Owner, as landlord, and the Operator, as tenant (the "Lease");

**WHEREAS** the Municipality receives wastewater from customers;

**WHEREAS** the Municipality desires to deliver wastewater to the Operator at the Facility.

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

## ARTICLE 1

## DEFINITIONS AND INTERPRETATION

**Section 1.01. Definitions**. Unless expressly defined differently elsewhere in the Agreement, capitalized terms used in this Agreement or any Exhibit, shall have the meanings set forth below.

"Affiliate" of a Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Basic Flow Payment" has the meaning ascribed to such term in Section 9.01(a).

"Back-Up Metering System" means any meters and metering devices installed, owned and maintained by the Operator for back-up purposes.

"Bankruptcy" of either Party means (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in or with a court or other Governmental Authority of competent jurisdiction seeking (x) liquidation, reorganization or other relief in respect of such Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (y) the

**EXHIBIT B**

appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; (ii) such Party shall (1) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (2) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (1), (3) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Party or for a substantial part of its assets, (4) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (5) make a general assignment for the benefit of creditors or (6) take any action for the purpose of effecting any of the foregoing; or (iii) such Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

"BFP Period" has the meaning ascribed thereto in Section 9.03.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banks in Nebraska or New York are required or authorized to close.

"Claim" means any claim, demand, action, cause of action, suit, proceeding or assessment.

"Collateral Consent" shall have the meaning ascribed to such term in Section 16.10.

"Commercial Operation Date" means the earlier of (a) the date occurring 21 months after the first draw on the Financing Agreements for construction of the Facility and (b) the day indicated in the notice from the Operator to the Municipality pursuant to Section 3.02.

"Confidential Information" has the meaning ascribed thereto in Section 16.12(a) hereof.

"Consultation Period" has the meaning ascribed thereto in Section 12.03(b) hereof.

"Contract Year" means a period of 12 consecutive months commencing on the Commercial Operation Date for the first Contract Year and for each Contract Year thereafter commencing on each anniversary of the Commercial Operation Date and ending as of the end of the day preceding the next anniversary of the Commercial Operation Date, except for the first Agreement Year, which shall start on the Commercial Operation Date.

"Discharge Surcharge" has the meaning ascribed to such term in Section 9.01(c).

"Dispute" means any dispute or disagreement of any kind whatsoever between the Parties in connection with or arising out of this Agreement.

"Emergency" means a condition or situation that, in the sole but reasonable opinion of the Operator:

**EXHIBIT B**

(a)     affects the ability of the Operator to safely operate the Facility; or

(b)     presents a physical threat to persons or property or the security, integrity or reliability of the Facility.

"Event of Default" means an Operator Event of Default or a Municipality Event of Default.

"Excess Wastewater" has the meaning ascribed to such term in Section 3.01.

"Facility" has the meaning ascribed to such term in the Recitals.

"Financial Closing" means:

(a)     the execution and delivery of the Financing Agreements; and

(b)     the satisfaction or waiver of the conditions precedent thereunder for an initial drawdown.

"Financing Agreements" means the loan agreements, leases, bonds, notes, indentures, security agreements, other evidences of indebtedness, guarantees and other documents relating to the construction and permanent financing (including refinancing) of the Facility or any part thereof.

"Force Majeure Event" has the meaning ascribed thereto in Section 13.01 hereof.

"Governmental Authority" shall mean the government of the United States of America, any other nation or any political subdivision of any of them, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guaranteed Minimum Amount" means the amount payable pursuant to Section 9.01(a).

"Independent Wastewater Analyst" shall mean a laboratory certified by the Nebraska Department of Environmental Quality.

"Initial Term" has the meaning ascribed thereto in Section 2.01.

"Interconnection and Transmission Facilities" means all facilities and equipment that must be constructed or installed by or for the Municipality on the Municipality's side of the Interconnection Point to enable the Municipality to deliver the Wastewater as required pursuant to this Agreement, as to be agreed by the Parties.

"Interconnection Deadline" has the meaning ascribed thereto in 5.02(b) hereof.

**EXHIBIT B**

"Interconnection Point" means the point where the Facility and the Interconnection and Transmission Facilities are connected at the Site and the Wastewater is transferred from the Municipality to the Operator.

"Invoice" has the meaning ascribed thereto in Section 9.04 hereof.

"Late Payment Rate" means a rate per annum 2% above the prime or base rate published from time to time by The Wall Street Journal, Eastern Edition, which shall be computed for the actual number of days on the basis of a 365-day year.

"Laws" means all federal, state or local laws in force, including all statutes, codes, rules, regulations, orders, directives, notifications made or issued by any Governmental Authority or other competent authority pursuant to or under any such law and any decree, judgment or other judicial decision given or pronounced by any arbitrator or court of competent jurisdiction.

"Lease has the meaning ascribed to such term in the Recitals.

"Lender Agent" means the collateral trustee for Lenders pursuant to Financing Agreements and each other agent or administrative agent acting on behalf of Lenders.

"Lender Cure Period" has the meaning ascribed thereto in Section 12.06(d).

"Lender Election Notice" has the meaning ascribed thereto in Section 12.06(c)(i).

"Lender Evaluation Period" has the meaning ascribed thereto in Section 12.06(c).

"Lenders" shall mean the lenders, noteholders, bondholders, and each other party which has provided financing, credit, indebtedness or a commitment therefor pursuant to any Financing Agreement.

"Loss" means any loss, damage, liability, payment or obligation (excluding any indirect or consequential loss, damage, liability, payment or obligation except as specifically set forth herein), and all associated expenses, including reasonable legal fees.

"Maintenance Outage" means a planned interruption of the Facility's operation that is for the purpose of inspection, testing, preventive maintenance, corrective maintenance, repairs, replacement or improvement of the Facility.

"Maximum Intake Amount" means, for any day, three million gallons of Wastewater, as that amount may be increased pursuant to the provisions of Section 3.01.

"Minimum Intake Amount" means, for any day, one million gallons of Wastewater.

"Metering Systems" means the Primary Metering System and the Back-Up Metering System.

"Municipality Event of Default" has the meaning ascribed thereto in Section 12.02.

EXHIBIT B

"Municipality Indemnified Persons" means the Municipality and its officers, directors and employees.

"Notice" has the meaning ascribed thereto in Section 16.01 hereof.

"Notice of Event of Default" has the meaning ascribed thereto in Section 12.03(a) hereof.

"Nutrients" means the matter contained in the Wastewater Baseline Specifications as detailed in Exhibit 1.

"Nutrient Surcharge" has the meaning ascribed thereto in Section 9.01(b).

"Operator Event of Default" has the meaning ascribed thereto in Section 12.01 hereof.

"Operator Indemnified Persons" means the Operator and its officers, directors, representatives, agents and employees.

"Operator Permits" means all Permits required to be issued to Owner, the Operator, the Replacement Operator or any contractor for the construction, financing, ownership, operation, and maintenance of the Facility.

"Party" means either the Municipality or the Operator.

"Permit" means any permit, approval, consent, authorization, acknowledgment or license required to be issued by any Governmental Authority.

"Person" means any individual or legal entity, including a corporation, general or limited partnership, proprietorship, joint venture, limited liability company, association, trust, unincorporated organization or Governmental Authority.

"Primary Metering System" means all meters and metering devices (including remote terminal units) used to measure the Wastewater intake (other than the Back-Up Metering System).

"Replacement Operator" has the meaning ascribed thereto in Section 12.04(b).

"Revised Basic Flow Payment" has the meaning ascribed thereto in Section 9.03.

"Scheduled Commercial Operation Date" means the date that the Operator reasonably believes to be the date that the Facility will commence commercial operation based on the construction schedule, as that may be revised.

"Site" means the land, spaces, waterways, roads, wells and any rights acquired or to be acquired for the Facility.

"Site Agreement" means the agreement to be executed between Owner and Community Development Agency of South Sioux City with respect to sale of the Site.

**EXHIBIT B**

"Taxes" shall mean all taxes, duties, levies, other impositions and fees imposed by the any Governmental Authority or any of its political subdivisions related to the transportation, sale or disposal of the Wastewater and the other transactions hereunder, including sales, property, excise, storage and consumption taxes, and fees applicable; provided that specifically excluded are:

    (a)    all taxes on income, profit, or on real or personal property;

    (b)    franchise taxes; and

    (c)    employment taxes or contributions imposed with respect to or measured by compensation paid to employees.

"Term" has the meaning ascribed thereto in Section 2.01 hereof.

"Termination Notice" has the meaning ascribed thereto in Section 12.03(a) hereof.

"Wastewater" means wastewater delivered by the Municipality to the Interconnection Point.

"Wastewater Specifications Composite Baseline" means the Wastewater Specification Composite Baseline set forth in Exhibit 1 hereto.

    **Section 1.02.  Rules of Construction.**  In the interpretation of this Agreement, unless the context otherwise requires:

    (a)    the singular includes the plural and vice versa and, in particular (but without limiting the generality of the foregoing), any word or expression defined in the singular has the corresponding meaning used in the plural and vice versa;

    (b)    any reference to any gender includes the other gender;

    (c)    unless otherwise specified, any reference to an Article, Section, paragraph, subparagraph, clause, subclause or Exhibit is a reference to an Article, Section, paragraph, subparagraph, clause, subclause or Exhibit hereof;

    (d)    any reference to an agreement, contract, instrument or other document shall:

        (i)    include all appendices, annexes, exhibits and schedules thereto; and

        (ii)    be a reference to such agreement, contract, instrument or other document as amended, supplemented, modified, suspended, restated or novated from time to time;

    (e)    any reference to "writing" or "written" includes printing, typing, e-mail, lithography and other means of reproducing words in a visible form;

**EXHIBIT B**

(f)     the headings and Article, Section and paragraph numbering contained in this Agreement are used solely for convenience and do not constitute a part of this Agreement, nor shall such headings and numbering be used in any manner to aid in the construction of this Agreement;

(g)     any reference to "hereof," "hereby," "hereto," "herein," "hereunder" or any other similar term is a reference to this Agreement as a whole, and not to any particular provision or part of this Agreement;

(h)     the term "including" shall mean "including, without limitation";

(i)     the term "or" is not exclusive;

(j)     any reference to any Law shall include all statutory and administrative provisions consolidating, amending or replacing such Law, and shall include all rules and regulations promulgated thereunder;

(k)     any reference to any Person includes its permitted successors and assigns;

(l)     unless otherwise specified, any right may be exercised at any time and from time to time;

(m)     the fact that counsel to any Party shall have drafted this Agreement shall not affect the interpretation of any provision hereof in a manner adverse to such Party or otherwise prejudice or impair the rights of such Party; and

(n)     the word "will" shall be construed to have the same meaning as the word "shall".

## ARTICLE 2

## TERM

**Section 2.01.   Initial Term.**  This Agreement shall commence and be effective on the date hereof and shall continue in full force and effect for 20 Contract Years commencing the Commercial Operation Date (the "Initial Term"); provided that this period may be extended in accordance with the terms hereof (the "Term").

**Section 2.02.   Extension.**  The parties shall commence negotiations regarding extending this Agreement no later than 36 months prior to the then scheduled date of termination. Any extensions negotiated will be at the mutual agreement of the parties.

## ARTICLE 3

## SALE AND PURCHASE OF WASTEWATER

**EXHIBIT B**

Section 3.01.  **Wastewater Intake**.  From and after the Commercial Operation Date, the Municipality shall deliver, and the Operator shall accept, the Wastewater in an amount not to exceed the Maximum Intake Amount.  Upon not less than one years' advance notice, the Municipal may request that the Maximum Intake Amount be increased.  The Operator, in its sole discretion, may agree to accept a larger daily flow of Wastewater from the Municipality and shall notify the Municipality of its decision.  If it does so agree to increase the maximum inflow of Wastewater, the Maximum Intake Amount shall be the amount so designated by the Operator in its notice, commencing on the date specified by the Operator.  If the Municipality delivers an amount of Wastewater in excess of the then effective Maximum Intake Amount ("Excess Wastewater"), the Operator may take such actions as it may determine, in its sole discretion, as prudent or desirable, including diverting the Excess Wastewater to Sioux City, Iowa's waste treatment plant or storing such Excess Wastewater in holding tanks, in each case, at the Municipality's sole cost and expense (including charges of the Operator for storage).  All Wastewater shall be delivered by the Municipality free and clear of any lien, security interest, or encumbrance of any kind.

Section 3.02.  **Condition Precedent.**  The obligations of the Operator under this Agreement are subject to the occurrence of the Commercial Operation Date; provided, however, if the Facility is constructed but cannot be tested or otherwise confirmed to be operational because the Municipality has failed to construct the Interconnection and Transmission Facilities or to deliver Wastewater, the provisions of Section 5.03 shall apply.  The Operator shall give the Municipality a notice of the Commercial Operation Date upon its occurrence if prior to the date referred to in clause (a) of the definition of the Commercial Operation Date.

Section 3.03.  **Observance of Technical Limits, Etc**.  Nothing contained in this Agreement shall be construed to require the Operator to operate the Facility at any time (including during an Emergency) in any manner inconsistent with the technical limits for the Facility, the design capacity of the Facility, prudent operating practices for facilities of this type or any Law.

Section 3.04.  **Analysis of Nutrients**.  The Operator shall, each day, take composite samples of the Wastewater and deliver such samples to the Independent Water Analyst to analyze the Nutrients in the Wastewater delivered to the Operator. The analysis of the Nutrients in the Wastewater by the Independent Water Analyst shall be final and conclusive, absent manifest error, and shall be binding on the Parties for all purposes of this Agreement.   All costs of sampling and quality analysis shall be borne by the Operator.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES

Section 4.01.  **Operator Representations and Warranties.**  The Operator represents and warrants to the Municipality and Owner as follows:

(a)  Organization, Etc.  It is duly incorporated, existing and in good standing under the Laws of Delaware.

**EXHIBIT B**

(b)  Power and Authority.  It has all requisite power and authority to conduct its business, to own its properties and to execute and deliver this Agreement and to perform its obligations hereunder.

(c)  Due Authorization.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by its board of directors, and no other proceeding on its part is necessary to authorize this Agreement and the transactions contemplated herein.

(d)  Enforceability.  This Agreement constitutes a legal, valid and binding obligation, and is enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights and general principles of equity.

(e)  No Violation.  The execution and delivery of, and performance of its obligations under, this Agreement by it does not and will not constitute a violation of:

(i)  any Law applicable or relating to it, its assets or its businesses.

(ii)  any provision of:

(x)  its charter, by-laws or other organic documents; or

(y)  any material indenture, contract or agreement to which it is a party or by which it or its properties may be bound.

(f)  Litigation.  There are no proceedings pending or, to the best of its knowledge, threatened that could materially adversely affect the performance by it of its obligations under this Agreement.

Section 4.02.  **Municipality Representations and Warranties.**  The Municipality hereby represents and warrants to the Operator and Owner that:

(a)  Organization, Etc.  It is a municipal corporation formed under the Laws of Nebraska, duly incorporated, existing and in good standing.

(b)  Power and Authority.  It has all requisite power and authority to conduct its business, to own its properties and to execute and deliver this Agreement and to perform its obligations hereunder.

(c)  Due Authorization.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the city council, and no other proceeding on its part is necessary to authorize this Agreement and the transactions contemplated herein.

(d)  Enforceability.  This Agreement constitutes a legal, valid and binding obligation, and is enforceable against it in accordance with its terms, except as such

**EXHIBIT B**

enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights and general principles of equity.

(e)     No Violation.  The execution and delivery of, and performance of its obligations under, this Agreement by it does not and will not constitute a violation of:

(i)     any Law applicable or relating to it, its assets or its businesses.

(ii)    any provision of:

(x) the Municipality's charter, by-laws or other organic documents; or

(y) any material indenture, ordinance, contract or agreement to which it is a party or by which it or its properties may be bound, including, all such ordinances, indentures, resolutions and other documents, agreements and instruments entered into in connection with any bonds issued by it.

(f)     Litigation.  There are no proceedings pending or, to the best of its knowledge, that could materially adversely affect the performance by it of its obligations under this Agreement.

(g)     No Immunity.  The Municipality is not entitled to any immunity in connection with this Agreement and the transactions contemplated hereby and, if any proceeding is brought against it in connection with this Agreement, no claim of immunity from such proceedings shall be made by or on behalf of the Municipality, and the Municipality hereto waives any right of immunity it may have in respect of any such proceeding.

(h)     No Appropriations.  No appropriation is necessary for the Municipality to make the payments required to be made hereunder or otherwise to meet its obligations hereunder.

Section 4.03.  **Owner Representations and Warranties.**  Owner represents and warrants to the Operator and Municipality as follows:

(a)     Organization, Etc.  It is duly incorporated, existing and in good standing under the Laws of its state of incorporation or formation.

(b)     Power and Authority.  It has all requisite power and authority to conduct its business, to own its properties and to execute and deliver this Agreement and to perform its obligations hereunder.

(c)     Due Authorization.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by its board of directors or other governing body, and no other proceeding on its part is necessary to authorize this Agreement and the transactions contemplated herein.

**EXHIBIT B**

(d)     _Enforceability._  This Agreement constitutes a legal, valid and binding obligation, and is enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights and general principles of equity.

(e)     _No Violation._  The execution and delivery of, and performance of its obligations under, this Agreement by it does not and will not constitute a violation of:

(i)     any Law applicable or relating to it, its assets or its businesses.

(ii)    any provision of:

(x)     its organic documents; or

(y)     any material indenture, contract or agreement to which it is a party or by which it or its properties may be bound.

(f)     _Litigation._  There are no proceedings pending or, to the best of its knowledge, threatened that could materially adversely affect the performance by it of its obligations under this Agreement.

## ARTICLE 5

## INTERCONNECTION AND TRANSMISSION FACILITIES

**Section 5.01.  Generally.**  The Municipality shall be responsible for the design, construction, installation, testing, operation and maintenance of the Interconnection and Transmission Facilities in accordance with the terms hereof and shall own all of the Interconnection and Transmission Facilities.  The Municipality shall bear all costs and expenses with respect to the Interconnection and Transmission Facilities.  The Municipality shall operate and maintain the Interconnection and Transmission Facilities:

(a)     in such a manner so as not to have a material adverse effect on the Facility; and

(b)     in accordance with prudent practices practiced by Persons who collect, transport or treat wastewater.

If a maintenance problem which is considered by the Operator to constitute an adverse material effect shall occur, the parties will contract with a qualified third party to determine the extent of the problem and any associated costs and expenses caused by such maintenance problem.

**Section 5.02.  Construction of the Interconnection and Transmission Facilities.**

(a)     _Notice of the Scheduled Commercial Operation Date._  The Operator shall give the Municipality at least 12 months' prior written notice of the Scheduled Commercial Operation Date.  If the Scheduled Commercial Operation Date is extended, the Operator shall give notice to the Municipality and, at the request of the Municipality, shall generally consult as

**EXHIBIT B**

to the progress of construction of the Facility. The Operator shall also give one months' and one weeks' prior notice of the Scheduled Commercial Operation Date.

(b)     Interconnection Deadline. The Municipality shall construct and test the Interconnection and Transmission Facilities 90 days prior to the Commercial Operation Date (the "Interconnection Deadline"). The Municipality shall periodically provide to the Operator reports on the progress of the design and construction of the Interconnection and Transmission Facilities. Such reports shall be prepared by an accredited engineer reasonably acceptable to the Operator.

Section 5.03. **Failure to Meet the Interconnection Deadline.** If for any reason the Municipality has not completed the Interconnection and Transmission Facilities by the Commercial Operation Date, the Municipality shall pay, in accordance with the procedures set out in Sections 9.01 and 9.03, and the Operator shall be entitled to receive, each month the Guaranteed Minimum Amount from and after the Commercial Operation Date.

Section 5.04. **Interconnection Equipment on the Facility's Side of the Interconnection Point.** The Operator shall be responsible for designing, constructing, installing and maintaining all auxiliary and interconnecting equipment on the Facility's side of the Interconnection Point. The Parties shall reasonably cooperate to implement connection of the Interconnection and Transmission Facilities to the Facility at the Interconnection Point.

ARTICLE 6

METERING

Section 6.01. **Generally.** The Operator shall, at its expense, procure, install the Primary Metering System and may, at its option, procure, install and maintain the Back-Up Metering System.

Section 6.02. **Installation of the Primary Metering System.** The Operator shall install the Primary Metering System on the Site and shall cause the Primary Metering System to be installed not later than 15 days prior to the date that the initial testing of the Facility is scheduled to begin.

Section 6.03. **Testing of the Metering Systems.**

(a)     The Operator shall periodically test each Metering System for accuracy. The Operator shall test the Primary Metering System not less often than every six months. Each such test shall be performed by a testing company certified by the manufacturer of the Metering System to calibrate that Metering System.

(b)     The Operator shall also test the Primary Metering System at any other time reasonably requested by the Municipality, which additional testing shall be at the Municipality's expense unless the test indicates that the Primary Metering System is inaccurate by more than 5%, in which case the Operator shall bear the cost of the additional test.

EXHIBIT B

**Section 6.04. Readings.**

(a) Daily Readings. The Operator shall read the Primary Metering System on each day to determine the flow of Wastewater from the Municipality for such day. The Operator shall maintain a log of all such meter readings.

(b) Primary Metering System Not in Service. If the Primary Metering System is not in service as a result of maintenance, repairs or testing, then the best available information, which may include the Back-Up Metering System, shall be used during the period that the Primary Metering System is not in service. The Operator shall provide an estimate of the amount of Wastewater delivered during such period.

(c) Inaccuracy of a Metering System. When, as a result of any test pursuant to Section 6.03 hereof, the Primary Metering System is found to be inaccurate by more than 5% or is otherwise functioning improperly, then the correct amount of wastewater delivered to the Operator for the actual period during which inaccurate measurements (if any) were made shall be determined as follows:

(d) First, the readings of the Back-Up Metering System (if any) may be utilized to calculate the correct amount of wastewater delivered.

(e) If there is no Back-Up Metering System or it is functioning improperly, then the Parties shall jointly prepare an estimate of the correct reading on the basis of all available information and such guidelines as may have been agreed to between the Parties.

## ARTICLE 7

### TITLE AND RISK OF LOSS; TAXES

**Section 7.01. Title.** Title and risk of Loss with respect to the Wastewater shall pass to the Operator at the Interconnection Point.

**Section 7.02. Taxes.** The Municipality shall be liable for and shall pay or cause to be paid and shall hold the Operator harmless from all Taxes related to or in connection with the transportation, sale, delivery or disposal of the Wastewater, and all other obligations of the Municipality hereunder. If the Operator shall have received from the Municipality the amount of applicable Taxes in accordance with Section 9.04, the Operator shall remit such Taxes to the appropriate Governmental Authority.

## ARTICLE 8

### OPERATION OF THE FACILITY

**Section 8.01. Maintenance Outages.** As the need arises for a Maintenance Outage, the Operator shall advise the Municipality of such need and of the commencement and estimated duration of the work to be performed. The Operator will give the Municipality not fewer than ten days' notice of any scheduled Maintenance Outage. The Operator, consistent

**EXHIBIT B**

with prudent practices, shall perform said maintenance in such a way as to minimize outage of the Facility.

Section 8.02. **Emergency Outage.** The Operator may shut down the Facility for an Emergency without giving the Municipality prior notice but it shall provide notice to the Municipality of the outage as soon as reasonably practicable.

## ARTICLE 9

## PAYMENTS

Section 9.01. **Calculation of Payments.**

(a)      The Municipality shall pay to the Operator for each month the greater of (x) $5.46 per thousand gallons of Wastewater delivered to the Facility ("Basic Flow Payment") and (y) the guaranteed minimum payment for such month calculated in accordance with this Section 9.01 (the "Guaranteed Minimum Amount"). In the first Contract Year the Guaranteed Minimum Amount shall be $225,000 per month. In each subsequent Contract Year the Guaranteed Minimum Amount per month shall be increased by 2% over the Guaranteed Minimum Amount in effect in the prior Contract Year. In no event shall the Guaranteed Minimum Amount ever be reduced.

(b)      The Municipality shall pay a surcharge (the "Nutrient Surcharge") if the Nutrients in the Wastewater in any month, as determined by the Independent Wastewater Analyst, exceeds the Wastewater Specifications Composite Baseline Totals as set forth in Exhibit 1 by 20% for such month. The Nutrient Surcharge shall be an amount equal to 25% of the Basic Flow Payment for such month, or $6.83 per thousand gallons of Wastewater delivered to the Facility for such month.

(c)      Until such time as the Operator has infrastructure in place and all Permits required so that it may directly discharge the treated Wastewater into the Missouri River, the Municipality shall pay a surcharge (the "Discharge Surcharge") equal to the amount that the Operator pays to Sioux City, Iowa for discharge of the Wastewater to Sioux City, Iowa's treatment facility.

Section 9.02. **Renegotiation of Basic Flow Charge.** The Parties shall negotiate in good faith an increase in the new Basic Flow Payment with the increased Basic Flow Payment ("Revised Basic Flow Payment") to go into effect for the Sixth Contract Year and for the subsequent four Contract Years. For each subsequent five Contract Year period (each such five Contract Year period, a "BFP Period"), the Parties shall negotiate in good faith an increase in the Revised Basic Flow Payment to be applicable for each such BFP Period. If the Parties shall not have negotiated the increased Revised Basic Flow Payment prior to the commencement of any BFP Period, the then effective Basic Flow Payment or Revised Basic Flow Payment, as applicable, shall remain in effect until the Parties shall have negotiated the Revised Basic Flow Payment to be applicable to such BFP Period and, once agreed, the Revised Basic Flow Payment shall be retroactive to the commencement of such BFP Period.

**EXHIBIT B**

The Operator shall recalculate the charges due from the Municipality from the commencement of such BFP Period using the newly negotiated Revised Basic Flow Payment and shall send a revised Invoice to the Municipality for such period.  If such Invoice indicates that an amount is due from the Municipality, it shall pay, within 15 days, the amount due to the Operator.  In no event shall any modifications of the Basic Flow Payment decrease the Guaranteed Minimum Amount.

Section 9.03.  **No Set-off; Non-terminability**.  Notwithstanding anything to the contrary in any agreement between the Parties, all payments made by the Municipality hereunder shall be made by the Municipality without notice, demand, counterclaim, set-off, deduction, or defense, and without abatement, suspension, deferment, diminution or reduction, free from any charges, assessments, impositions, expenses or deductions of any and every kind or nature whatsoever.  Additionally, the Municipality will not assert against any assignee of this Agreement any defense, counterclaim, setoff or recoupment by reason of any past, present, or future claims which the Municipality may have against the Operator or the Owner.

Except as otherwise expressly provided herein, this Agreement shall not terminate, nor shall Municipality nor any other Party have any right to terminate this Agreement or to be released or discharged from any obligations or liabilities hereunder for any reason, including:  (i) any damage to or destruction of all or any portion of the Facility or the Interconnection and Transmission Facilities; (ii) any restriction, deprivation (including eviction) or prevention of, or any interference with, any use or the occupancy of all or any part of the Facility or the Interconnection and Transmission Facilities (whether due to any defect in or failure of any Party's ownership in the Facility or the Interconnection and Transmission Facilities or otherwise); (iii) any condemnation, requisition, eminent domain event or other taking or sale of the use, occupancy or title of or to all or any part of the Facility or the Interconnection and Transmission Facilities; (iv) any action, omission or breach on the part of any Party under this Agreement or under any other agreement between Municipality, Owner or Operator; (v) any sale or other disposition of the Facility; (vi) the impossibility or illegality of performance by Municipality, Owner or Operator or all such Parties under this Agreement; (vii) any action of any court, administrative agency or other governmental authority; or (viii) any other cause, whether similar or dissimilar to the foregoing, any present or future law notwithstanding.

Section 9.04.  **Invoices.**  From and after the Commercial Operation Date, the Municipality shall pay to the Operator the Guaranteed Minimum Amount on or before the tenth day of each month with respect to the previous month regardless of whether an invoice has been sent and regardless of whether it has delivered any Wastewater in the previous month.  For each month, the Operator shall prepare an invoice (an "Invoice") setting out the amount of Wastewater received (as recorded by the Metering System) and the Nutrient content, as reported by the Independent Wastewater Analyst, the amount of the Discharge Surcharge, if any, any applicable Taxes and detailing for such month all amounts payable by the Municipality to the Operator.  The Operator shall submit each invoice to the Municipality no later than 14 days after the end of the month for which such invoice is applicable.  The amount payable to the Operator pursuant to any Invoice (less the Guaranteed Minimum Amount for such month to the

**EXHIBIT B**

extent already timely paid by the Municipality, but not less than zero) shall be due and payable 30 days after the date delivered to the Municipality.

Section 9.05. **Late Payments.** Unless otherwise specified, any amount not paid when due (whether in respect of an Invoice, or otherwise) shall bear interest at a rate per annum equal to the Late Payment Rate.

## ARTICLE 10

### INSURANCE

### Section 10.01. Maintenance of Insurance Policies.

(a) Operator. The Operator, at its sole cost and expense, shall obtain and maintain, or cause to be obtained and maintained, all appropriate and necessary policies of insurance to protect the Facility as would be obtained by prudent operators of similar facilities. Such policies of insurance shall include the following:

(i) Property Insurance;

(ii) Commercial General Liability – Special Causes of Loss;

(iii) Business - Automobile (to the extent not covered under the above CGL policy);

(iv) Worker's Compensation;

(v) Employers Liability;

(vi) Pollution Liability; and

(vii) Business Interruption.

The Operator shall provide certificates of insurance to the Municipality for the insurance required by this Section 10.01(a)(i)-(vii) on an annual basis.

(b) Municipality. The Municipality, at its sole cost and expense, shall obtain and maintain, or cause to be obtained and maintained, all appropriate and necessary policies of insurance to protect the Interconnection and Transmission Facilities and its obligations hereunder as would be obtained by prudent operators of similar facilities. Such policies of insurance shall include the following:

(i) Property Insurance;

(ii) Commercial General Liability – Special Causes of Loss;

(iii) Business - Automobile (to the extent not covered under the above CGL policy);

- 16 -

EXHIBIT B

      (iv)     Worker's Compensation;

      (v)     Employers Liability; and

      (vi)     Pollution Liability.

The Municipality shall provide certificates of insurance to the Operator for the insurance required by this Section 10.01(b)(i)-(vi) on an annual basis.

## ARTICLE 11

## COVENANTS

### Section 11.01.  Operator Covenants.

(a)    Maintenance of Books, Records and Accounts.  The Operator shall keep proper books, records and accounts, in sufficient detail, in which correct entries shall be made of the meter readings of the Metering Systems and the reports issued by the Independent Wastewater Analyst.  The Operator shall permit the Municipality or its accountants to examine all relevant books, records, reports and other papers of the Operator for the purpose of verifying:

      (i)     the amount and calculation of the Basic Flow Payment;

      (ii)     the determination of the Nutrient Surcharge.

Any such examination by the Municipality shall be made during regular business hours and upon reasonable advance notice to the Operator.  In connection with such examination, the Operator shall permit the Municipality and its accountants to make copies and extracts of such books, records, reports and other papers and to discuss such matters with the Operator's officers and employees.

(b)    Operation in Accordance with Laws.  The Operator shall operate the Facility in accordance with all applicable Laws including applicable Laws of the U.S. Environmental Protection Agency, Nebraska Division of Environmental Quality and the Iowa Department of Natural Resources.

### Section 11.02.  Municipality Covenants.

(a)    Interconnection and Transmission Facilities.  The Municipality shall design, construct, own, operate, and maintain the Interconnection and Transmission Facilities in accordance with:

      (i)     the requirements of Article 5 hereof;

      (ii)     prudent operating procedures; and

      (iii)     all applicable Laws.

**EXHIBIT B**

(b) <u>Financial Closing</u>.  At the Financial Closing, the Municipality shall:

(i) deliver a certificate, executed by a duly authorized officer of the Municipality, affirming the representations and warranties set forth in Section 4.02 hereof and other usual closing certificates and documents;

(ii) the Collateral Consent as required by Lenders; and

(iii) cause its counsel to issue an opinion affirming the validity of such representations and warranties and setting forth such further matters as the Lenders may reasonably request, including that the Tipping Agreement has been duly authorized, executed and delivered and constitutes a legally binding contract of the Municipality that is enforceable in accordance with its terms.

(c) <u>Operator Permits</u>.  The Municipality shall use reasonable efforts to assist the Operator in obtaining on a timely basis and in maintaining all Operator Permits.

(d) <u>Change in Law</u>.  To the extent there is a change in Law, the Municipality shall use reasonable efforts to assist the Operator to obtain all Operator Permits necessary for the continued operation or maintenance of the Facility.  If as a result of a change in law the defense of immunity in respect of contract claims becomes available to Municipality, Municipality agrees, to the fullest extent permitted by law, not to assert the defense of immunity in any proceeding to enforce any of the obligations of Municipality under this Agreement or any other document related to the Facility or the Financing Agreements in any court of competent jurisdiction.

(e) <u>Audited Financial Statements</u>.  To the extent that the annual audited financial statements of the Municipality are not publicly available, the Municipality shall deliver to the Owner, Operator and Lenders, within 120 days of the end of each fiscal year, its annual audited financial statements prepared in accordance with generally accepted accounting principles.

## ARTICLE 12

## EVENTS OF DEFAULT; REMEDIES

**Section 12.01.  Operator Events of Default.**  Each of the following shall be an "Operator Event of Default":

(a) <u>Bankruptcy</u>.  The Bankruptcy of the Operator;

(b) <u>Other Material Breach</u>.  The Facility fails to take the Wastewater, as required hereunder, and the Operator has not remedied such failure within 180 days after notice from the Municipality stating that a material breach hereof as a result of such failure has

**EXHIBIT B**

occurred and is continuing that could result in the termination hereof; provided that no such event described in this Section 12.01 shall be an Operator Event of Default if it:

    (i)  results from a breach by the Municipality; or

    (ii)  occurs as a result of or during a Force Majeure Event or as a result of an Emergency.

  **Section 12.02.  Municipality Events of Default.**  Each of the following shall be a "Municipality Event of Default":

    (a)  Bankruptcy.  The Bankruptcy of the Municipality;

    (b)  Misrepresentation.  Any representation or warranty made by the Municipality in Section 4.02 hereof proves to have been incorrect in any respect when made (or when deemed to have been made) and such incorrect representation or warranty has a material adverse effect on the Municipality's ability to perform its obligations under this Agreement;

    (c)  Payment.  The failure by the Municipality to make any payment required to be made by it hereunder within five Business Days after the due date therefor;

    (d)  Other Material Breach.  Any other material breach hereof by the Municipality that is not remedied within 10 days after notice from the Operator stating that a material breach hereof has occurred and is continuing that could result in the termination hereof, identifying the material breach in question in reasonable detail and demanding remedy thereof.

  **Section 12.03.  Termination.**

    (a)  Notice of Intent to Terminate.  Upon the occurrence of a Municipality Event of Default that is not cured within the applicable period (if any) for cure, but only after receiving any required consent of the Lenders, the Operator may  terminate this Agreement by delivering a written notice of termination (a "Termination Notice") to the Municipality, whereupon this Agreement shall immediately terminate and the provisions of 12.05(d) shall apply.  Upon the occurrence of an Operator Event of Default, the Municipality, at its option, may initiate a period of consultation hereof by delivering a written notice (a "Notice of Event of Default")  to the Operator with a copy to Owner and the Lender Agent and the Lenders.

    (b)  Consultation Period.  Following the giving of a Notice of Event of Default by the Municipality, the Parties shall consult for a period of 90 days, or such longer period as the Parties mutually may agree (the "Consultation Period"), as to what steps shall be taken with a view to mitigating the consequences of the relevant event taking into account all prevailing circumstances; provided that in the case of a Bankruptcy of the Operator no Consultation Period shall be available, and the Municipality shall be entitled to immediately exercise its rights in Section 12.04.  During any Consultation Period, the Operator shall continue to undertake efforts to cure the failure to take the Wastewater which resulted in the Operator Event of Default, and if the Operator Event of Default is cured prior to the Municipality taking any option set forth in Section 12.04 below, the Municipality shall have no right to take any such action.

**EXHIBIT B**

**Section 12.04.  Municipality Step in Rights and Option to Purchase.**  Upon the expiration of the Consultation Period (if any) and unless the Operator Event of Default giving rise to the Notice of Event of Default shall have been remedied, the Municipality shall have the rights set forth in this Section 12.04.

(a)  Step-In Right. Subject to the rights of the Lenders in Section 12.06 and in any Collateral Consent executed between the Municipality and the Lenders, or the Lender Agent, the Municipality, after providing Owner and the Operator written notice of its intention to do so:

(i)  shall be entitled to enter the Facility and operate it until the Operator demonstrates to the reasonable satisfaction of the Municipality that it can and will resume normal operation of the Facility; and

(ii)  with the consent of the Lenders and Owner, shall be entitled to replace the Operator with another Person (the "Replacement Operator"), of good reputation, experienced in the operation and maintenance of Facilities of this kind, to whom this Agreement shall be assigned without further action by the Operator. The Replacement Operator shall also take over the Lease and Owner shall cooperate in such Lease assignment.  The Replacement Operator shall not assume the liability of the Operator for Operator Events of Default prior to the assignment of this Agreement to it, and the Replacement Operator shall have a reasonable time to take possession of the Facility and to cure the Operator Event of Default.  The Operator shall not be discharged of any liability pursuant hereto that arose prior to the assignment of this Agreement and all such liability shall expressly survive such assignment and the Operator shall hereby indemnify and hold harmless the Municipality and Owner for all Losses incurred as a result of such Operator Event of Default and for all costs and expenses in connection with the identification of and negotiation with the Replacement Operator and all Losses in connection therewith.

(b)  Option to Purchase.  Owner grants to the Municipality the option, subject to the terms and conditions hereof, to purchase the Facility from Owner at a price determined by the Owner, taking into consideration construction costs, financing costs, expected returns and other relevant factors in its reasonable judgment.  The option may only be exercised (i) upon termination of the Consultation Period, and only if the Operator has not cured the Operator Event of Default and (ii) is subject to any rights of the Lenders.

**Section 12.05.  Other Remedies.**

**EXHIBIT B**

(a)  Suspension of Operations.  The Operator may, by giving at least 10 days' notice to the Municipality, suspend receipt of Wastewater from the Municipality upon any failure by the Municipality to pay any amounts due to the Operator within 45 days from the due date thereof.

(b)  Remedies Cumulative.  Remedies are cumulative, and the exercise of, or failure to exercise, one or more of them by a Party shall not limit or preclude the exercise of, or constitute a waiver of, other remedies by such Party.

(c)  Damages Caused by a Breach by Municipality.  The Municipality acknowledges that the receipt of the Guaranteed Minimum Amount is necessary in order to make required payments under the Financing Agreements.  If the Operator terminates this Agreement during the Initial Term for a Municipality Event of Default, the Loss that the Operator will suffer, and for which the Municipality acknowledges that it will be liable, shall include amounts owed under the Financing Agreements, including payments required as a result of a default thereunder.

**Section 12.06.  Lender Cure Rights**.

(a)  Generally.  From and after the Financial Closing Date, no exercise of the rights set out in Section 12.04(a) hereof by shall be valid or binding without the Notice of Event of Default and the expiration of the Consultation Period and the Lender Cure Period provided in this Section 12.06.  The Lenders may make, but shall be under no obligation to make, any payment or perform any act required to be made or performed by the Operator, and any such payment or performance shall have the same effect as if made or performed by the Operator.

(b)  Anything in this Agreement notwithstanding, from and after the Financial Closing Date, the Municipality shall not seek to exercise its rights set forth in Section 12.04(a), as the result of any Operator Event of Default, without first giving to the Lenders a copy of any Notice of Event of Default.

(c)  Lender Evaluation Period.  If the Lenders fail to cure or are unable or unwilling to cure any Operator Event of Default within the Consultation Period, the Municipality shall have all its rights and remedies with respect to such Operator Event of Default as set forth in this Agreement; provided that if the cure by the Lenders of the Operator Event of Default requires the Lenders to take control of, and occupy, the Facility, upon the termination of the Consultation Period, the Lenders shall have a further period (the "Lender Evaluation Period") during which the Lenders may evaluate such Operator Event of Default, the condition of the Facility, and other matters relevant to the actions to be taken by the Lenders concerning such Operator Event of Default.  The Lenders Evaluation Period shall end on the earlier to occur of:

(i)  the Lenders' delivery to the Municipality of a notice that the Lenders have elected to pursue their remedies under the Financing Agreements and to attempt diligently to cure such Operator Event of Default (a "Lender Election Notice"); or

(ii)  30 Days following the end of the Consultation Period.

**EXHIBIT B**

(d)     Lender Cure Period.  Upon the delivery of the Lenders Election Notice, the Lenders shall be granted an additional period (the "Lender Cure Period") to cure any Operator Event of Default.  The Lender Cure Period shall be:

(i)     180 Days if the cure by the Lenders of the Operator Event of Default requires the Lenders to take control of the Facility;

(ii)    one year if the Municipality has assumed the operation of the Facility pursuant to Section 12.04(a) hereof and the Facility is being operated by the Operator to its satisfaction; or

(iii)   45 Days in all other cases.

(e)     If the Lenders fail to cure any Operator Event of Default on or before the expiration of the Lender Cure Period, the Municipality may exercise its rights and remedies with respect to such Operator Event of Default.

Section 12.07.  Owner Cure Rights.  Upon the expiration of the Consultation Period (if any) and unless the Operator Event of Default giving rise to the Notice of Event of Default shall have been remedied and, further, unless the Municipality has exercised its rights under Section 12.04,  Owner after notice to the Municipality, the Operator and the Lender Agent:

(a)     shall be entitled to enter the Facility and operate it until the Operator demonstrates to the reasonable satisfaction of the Municipality that it can and will resume normal operation of the Facility; and

(b)     shall be entitled to replace the Operator with a Replacement Operator, of good reputation, experienced in the operation and  maintenance of Facilities of this kind, to whom this Agreement shall be assigned without further action by the Operator.  The Municipality shall cooperate with Owner and shall execute any consent or assignment to effectuate the assignment of this Agreement to the Replacement Operator.

## ARTICLE 13

## FORCE MAJEURE

Section 13.01.  Definition.

(a)     "Force Majeure Event" means any event or circumstance or combination of events or circumstances that materially adversely affects, wholly or partly prevents or unavoidably delays any Party in the performance of its obligations under this Agreement (other than the payment of money), but only if and to the extent that:

(i)     such events and circumstances are not within the reasonable control of such Party;

(ii)    such circumstance, despite the exercise of reasonable diligence, cannot be prevented, avoided or removed by such Party and is

EXHIBIT B

not the result of the negligence or wilful misconduct of such Party; and

(iii) such circumstance is not the result of the failure of such Party to perform any of its obligations under any of the Project Documents.

(b) Subject to paragraph (a) above Force Majeure Event shall include:

(i) any act of war (whether declared or not) invasion, armed conflict, civil strife involving armed action or act of foreign enemy, blockade, riot, terrorism or exercise of military power; or

(ii) any earthquake, volcanic eruption, meteorites, flood, drought, fire, lightning, storm, hurricane, accumulation of snow or ice, rain of an acidic or otherwise contaminated nature or any other act of God or natural environmental disaster wherever occurring; or

(iii) any damage to the Facility caused by a third party other than any invitees, licensees or other Indemnified Party of the Operator;

(iv) any lawful action or failure to act (including any action or failure to act by any duly authorised agent of any such Governmental Authority) by any Governmental Authority that affects the Operator, including the denial or delay in the granting of any Permit for the Facility, the failure of any such Permit once granted to remain in full force and effect or to be renewed on substantially similar terms (provided, that with respect to any Permit, the Operator has duly applied for such Permit and undertaken reasonable efforts to obtain such Permit); or

(v) any condition of and circumstance affecting the soil, subsurface, environmental, geological, seismic, geotechnical, hydrological conditions of the Sites; or

(vi) labor strikes, or any other form of industrial action.

**Section 13.02.  Notification Obligations.**

(a)  Commencement of a Force Majeure Event.  If by reason of a Force Majeure Event a Party is wholly or partially unable to carry out its obligations under this Agreement, the affected Party shall give the other Party:

(i) an initial notice of such Force Majeure Event as soon as practicable, but in any event not later than (x) 48 hours after the occurrence of the Force Majeure Event or (y) six hours after the resumption of any means of providing notice between the Parties, whichever is later; and

**EXHIBIT B**

(ii)      a second notice as soon as practicable, but in any event not later than seven days after the initial notice of the occurrence of such Force Majeure Event, describing such Force Majeure Event in reasonable detail and, to the extent that can be reasonably determined at the time of the second notice, providing a preliminary evaluation of the obligations affected, a preliminary estimate of the period of time that the affected Party will be unable to perform the obligations and other relevant matters.

When appropriate or when reasonably requested to do so by the other Party, the affected Party shall provide further notices to the other Party more fully describing such Force Majeure Event and its causes and providing or updating information relating to the efforts of the affected Party to avoid and/or to mitigate the effects thereof and estimates, to the extent practicable, of the time that the affected Party reasonably expects it will be unable to carry out any of its affected obligations due to such Force Majeure Event.

(b)    <u>Cessation of the Force Majeure Event</u>.  The affected Party shall also provide notice to the other Party of:

(i)      with respect to an ongoing Force Majeure Event, the cessation of the Force Majeure Event; and

(ii)      the affected Party's ability to recommence performance of its obligations under this Agreement,

in each case as soon as possible, but in any event, not later than seven days after the occurrence of such cessation or ability to recommence performance, as the case may be.

**Section 13.03.  <u>Duty to Mitigate</u>.**  The affected Party shall use all reasonable efforts to mitigate the effects of a Force Majeure Event, including the payment of all reasonable sums of money by or on behalf of the affected Party to the extent that such sums are reasonable in light of the likely efficacy of the mitigation measures.

**Section 13.04.  <u>Excuse of Performance</u>.**

(a)    So long as the affected Party has at all times since the occurrence of a Force Majeure Event complied with the obligations of Section 13.03 hereof and continues to so comply, then:

(i)      the affected Party shall not be liable for any failure or delay in performing its obligations (other than an obligation to make a payment) under or pursuant to this Agreement caused by such Force Majeure Event; and

(ii)      any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended.

**EXHIBIT B**

   (b) <u>No Liability for Costs or Expenses</u>.  Without prejudice to amounts payable pursuant to Article 15 hereof or this Article 13, the unaffected Party shall not bear any liability for any loss or expense suffered by the affected Party as a result of a Force Majeure Event.

## ARTICLE 14

## DISPUTE RESOLUTION

**Section 14.01. <u>Resolution by the Parties</u>.**

   (a) If a Dispute arises, the Parties shall attempt in good faith to settle such Dispute by mutual discussions within 30 days after the date that the disputing Party gives written notice of the Dispute to the other Party.

   (b) If the Dispute is not resolved or referred to arbitration in accordance with Section 14.02(a) hereof, either Party may refer the Dispute to the chief executive officer or chief operating officer of the Parties for further consideration.  If such individuals are unable to reach agreement within 15 days (or such longer period as they may agree), the Parties may commence arbitration of the Dispute in accordance with Section 14.02 hereof.

**Section 14.02. <u>Arbitration</u>.**  Any Dispute not resolved following the procedures described in Sections 14.01 and 14.02 hereof shall be submitted to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator shall be final and binding on the Parties and may be entered in any court having jurisdiction hereof.  If, among the recommended arbitrators who are knowledgeable about this industry and experienced as arbitrators, there are any Nebraska residents, preference will be given to appointing a Nebraska resident.

## ARTICLE 15

## LIABILITY AND INDEMNIFICATION

**Section 15.01. <u>Limitation of Liability</u>.**  Except as provided in Section 15.02 hereof with respect to Losses claimed by third parties or Section 12.05(d), and without limiting the payments specified elsewhere in this Agreement, neither Party shall be liable to the other Party in contract, tort, warranty, strict liability or any other legal theory for any indirect, consequential, incidental, punitive or exemplary damages.  Neither Party shall have any liability to the other Party except pursuant to, or for breach of, this Agreement; <u>provided</u> that this provision is not intended to constitute a waiver of any rights of one Party against the other with regard to matters unrelated to this Agreement or any activity not contemplated by this Agreement.

**Section 15.02. <u>Indemnification</u>.**

   (a) <u>By the Municipality</u>.  In addition to any amounts payable under Section 12.05(d), the Municipality shall indemnify and defend each Operator Indemnified Person against, and hold each Operator Indemnified Person harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained or required to be paid, directly or

EXHIBIT B

indirectly, by, or sought to be imposed upon, such Operator Indemnified Person (i) personal injury or death to persons or damage to property arising out of any negligent or intentional act or omission by the Municipality in connection with this Agreement or (ii) any actual or prospective claim, litigation, investigation or proceeding relating to this Agreement or the transactions hereunder foregoing, whether based on contract, tort or any other theory and regardless of whether any Operator Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Operator); provided, however, that such indemnity shall not be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of such Operator Indemnified Person .

(b)    By the Operator.  The Operator shall indemnify and defend each Municipality Indemnified Person against, and hold each Municipality Indemnified Person harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained or required to be paid, directly or indirectly, by, or sought to be imposed upon, such Municipality Indemnified Person for personal injury or death to persons or damage to property arising out of any negligent or intentional act or omission by the Operator in connection with this Agreement.

(c)    Joint Fault.  If any injury or damage results from the joint or concurrent negligent or intentional acts or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

**Section 15.03.  Defense of Claims.**

(a)    Notice.  Each Party shall promptly notify the other Party of any Loss or Claim in respect of which it is or may be entitled to indemnification under Section 15.02 hereof. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or Claim.

(b)    Defense.  The indemnifying Party shall be entitled, at its option and expense and with counsel of its selection, to assume and control the defense of such Claim at its expense with counsel of its selection, subject to the prior approval of the indemnified Person; provided that such Indemnifying Party:

(i)    gives prompt notice of its intention to do so to the indemnified Person;

(ii)   acknowledges its obligation to indemnify the indemnified Person for all Losses arising out of such Claim; and

(iii)  reimburses the indemnified Person for the reasonable costs and expenses incurred by the indemnified Person prior to the assumption by the indemnifying Party of such defense.

**EXHIBIT B**

(c)     Right of an Indemnified Person to Defend.  Unless and until the indemnifying Party acknowledges in writing its obligation to indemnify the indemnified Person and assumes control of the defense of a Claim in accordance with Section 15.03(b) hereof, the indemnified Person shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any Claim by any third party alleged or asserted against such Person in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expense thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(d)     Settlement of Claims.  Neither Party shall be entitled to settle or compromise any such Claim without the prior written consent of the indemnifying Party, provided that after agreeing in writing to indemnify the indemnified Person, the indemnifying Party may settle or compromise any claim without the approval of the indemnified Person.

(e)     Independent Counsel.  Following the acknowledgment of the indemnification and the assumption of the defense by the indemnifying Party, the indemnified Person shall have the right to employ its own counsel and such counsel may participate in such Claim, but the fees and expenses of such counsel shall be at the expense of such indemnified Person, when and as incurred, unless:

(i)     the employment of counsel by such indemnified Person has been authorized in writing by the indemnifying Party;

(ii)    the indemnified Person shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Person in the conduct of the defense of such action;

(iii)   the indemnifying Party shall not in fact have employed independent counsel reasonably satisfactory to the indemnified Person to assume the defense of such action and shall have been so notified by the indemnified Person; or

(iv)    the indemnified Person shall have reasonably concluded and specifically notified the indemnifying Party either that there may be specific defenses available to it that are different from or additional to those available to the indemnifying Party or that such Claim involves or could have a material adverse effect upon it beyond the scope hereof.

If clause (ii), (iii) or (iv) of the preceding sentence shall be applicable, then counsel for the indemnified Person shall have the right to direct the defense of such Claim on behalf of the indemnified Person and the reasonable fees and disbursements of such counsel shall constitute legal or other expenses hereunder.

**EXHIBIT B**

## ARTICLE 16

## MISCELLANEOUS PROVISIONS

### Section 16.01.  Notices

(a)    Methods and Effectiveness.  All notices, requests, consents and other communications hereunder (each, a "**_Notice_**") shall be in writing and shall be delivered by one or more of the following methods:

| Method | Date of Effectiveness |
|---|---|
| Personal delivery | Date delivered |
| Facsimile with return confirmation of transmission | Date sent, if during business hours, or the next Business Day, if sent after business hours |
| Nationally recognized overnight courier service | Three Business Days after the date sent |
| First-class certified mail, postage prepaid and return receipt requested | Fifth day after the date sent |

Except as otherwise expressly provided herein, all Notices shall be in writing.

(b)    Addresses.  Unless otherwise notified in writing, for the purposes of this Section 16.01, the addresses and facsimile numbers of the Parties are:

If to the Operator:

> 6601 County Road R
> Denmark, WI  54208
> Attention: Rob Larson
> Facsimile: 920-863-5546

If to the Municipality:

> 1615 First Avenue,
> South Sioux City, NE 68776
> Attention: Lance Hedquist
> Facsimile: 402-494-7527

**EXHIBIT B**

If to Owner:

> Net Lease Capital Advisors
> Ten Tara Boulevard, Suite 130
> Nashua, NH 03062
> Attention:  Richard G. Greer
> Facsimile: 603-598-9900

> With a copy (which shall not constitute a notice, request, demand, waiver or other communication to Owner):

> Kelley Drye & Warren LLP
> 101 Park Avenue
> New York, NY  10178
> Attention:   Jack A. Garrity
> Facsimile: 212-808-7897

If to a Lenders or the Lender Agent:

> At its address specified in a notice from the Operator (or such other address as the Lenders or the Lender Agent may have specified by written notice delivered in accordance herewith).

> With a copy (which shall not constitute a notice, request, demand, waiver or other communication to Lenders or the Lender Agent) as they may designate.

or to such other place as such Person  may designate as to itself by written notice to the other Party or Parties.

Section 16.02. **Choice of Law.**  This Agreement and the rights and obligations hereunder shall be interpreted, construed and governed by the laws of Nebraska, without giving effect to any provision of law that would require the application of a law of another jurisdiction.

Section 16.03. **Amendments, Etc.**  All amendments, supplements, other modifications, waivers and consents in respect of this Agreement shall be binding only if (a) in writing, (b) expressly stated to be such an amendment, supplement, other modification, waiver or consent and (c) signed by duly authorized representatives of the Parties (or, in the case of a consent or waiver, by the Party granting such consent or waiver).

Section 16.04. **No Implied Waivers.**  No waiver by either Party of any breach or default by the other Party in the performance of any provision hereof shall operate or be construed as a waiver of any other or further breach or default, whether of a like or different character.  Neither the failure by either Party to insist on any occasion upon the performance of the terms, conditions and provisions hereof nor time or other indulgence granted by one Party to the other shall act as a waiver of such breach or acceptance of any variation or the relinquishment of any such right or any other right hereunder, which shall remain in full force and effect.

**EXHIBIT B**

Section 16.05. **Headings.** The headings contained in this Agreement (a) are used solely for convenience, (b) do not constitute a part hereof and (c) shall not be used in any manner to aid in the construction or interpretation hereof.

Section 16.06. **Third Parties.** This Agreement is intended solely for the benefit of the Parties hereto and, except for rights expressly granted to Lenders:

(a)     nothing in this Agreement shall be construed to create any duty to, standard of care with reference to, or any liability to, any Person other than a Party;

(b)     no Person shall be deemed a third party beneficiary of this Agreement; and

(c)     this Agreement shall not confer any right of suit or action whatsoever on any Person not a Party except for the rights granted to the Lenders.

Section 16.07. **Relationship of the Parties.** This Agreement shall not be interpreted or construed to create an association, joint venture or partnership between the Parties or to impose any partnership obligation or liability or fiduciary obligation upon either Party. No Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, any other Party except as provided in Section 16.10.

Section 16.08. **Survival.** Cancellation, expiration or earlier termination hereof shall not relieve the Parties of obligations that by their nature should survive such cancellation, expiration or termination, including warranties, remedies, indemnification obligations and confidentiality obligations.

Section 16.09. **Integration Clause.** This Agreement and the Lease are intended by the Parties as (a) the final expression of their agreement on the matters contained herein and (b) a complete and exclusive statement of the terms of their agreement. All prior written or oral representations, understandings, offers or other communications of every kind pertaining to the sale or purchase of Wastewater hereunder are hereby abrogated and withdrawn.

Section 16.10. **Assignment.**

(a)     Generally. Except as provided in Sections 12.05, 12.07 and Section 16.10(b), no party may assign this Agreement (including by granting a security interest therein) other than by mutual written agreement between the Parties, except that Owner and the Operator each shall be entitled to assign its rights hereunder (and to convey its interest in:

(i)     this Agreement; or

(ii)    the revenues or any of the rights or assets of Owner or the Operator, as the case maybe, to any Affiliate, or as security for the benefit of the Lenders without the consent or agreement of the Municipality.

**EXHIBIT B**

The Municipality shall execute a consent to assignment in the form typically required by Lenders in project finance transactions (the "Collateral Consent").

(b)     Assignment for Operator Event of Default.  Without the consent or written agreement of the Operator, this Agreement may be assigned by written agreement of the Municipality and the Replacement Operator in accordance with the terms and conditions of Section 12.06 or Section 12.07; provided, however, that any such assignment shall not be effective unless the written consent of Owner.

**Section 16.11.  Successors and Assigns.**  This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns.

**Section 16.12.  Confidentiality.**

(a)     Confidential Information.  "Confidential Information" shall mean all documents and other information (whether technical, commercial or otherwise):

(i)     supplied to it by or on behalf of the other Party relating to the design, construction, insurance, operation, maintenance, management and financing of the Facility;

(ii)    obtained by it in the course of any inspection performed in accordance with the terms hereof;

(iii)   relating to the terms of this Agreement;

provided that Confidential Information shall not include information:

(x)     in the public domain otherwise than by breach hereof;

(y)     in the possession of the receiving Party thereof before divulgence as aforesaid that was not obtained under any obligation of confidentiality; and

(z)     obtained from a third party that is free to divulge the same that is not obtained under any obligation of confidentiality.

(b)     Confidentiality Obligation.  Each Party and its contractors, consultants and agents:

(i)     shall hold in confidence all Confidential Information; and

(ii)    except as required by law or appropriate regulatory authorities, prospective Lenders and their professional advisers, shall not publish or otherwise disclose or use any Confidential Information for its own purposes otherwise than as may be required to perform its obligations under this Agreement;

**EXHIBIT B**

provided that nothing herein contained shall preclude the use of provisions similar to those contained in this Agreement referred to herein and in agreements prepared and issued in connection with other projects.

**Section 16.13.  Approval Not to be Unreasonably Withheld or Delayed.**  Unless otherwise provided herein with respect to a particular provision, whenever the acceptance, consent or approval of a Party is required herein, such acceptance, consent or approval shall not be unreasonably withheld or delayed by such Party.

**Section 16.14.  Environmental Attributes**.  All environmental attributes shall be the property of the Operator.

IN WITNESS WHEREOF the Parties have executed and delivered this Agreement as of the date first above written.

SOUTH SIOUX CITY

By: _____
Name: WILLIAM I McCARTY
Title: MAYOR

BIG OX ENERGY, INC.

By: _____
Name: Radyn Larsen
Title: CEO

2014 ACQUISITIONS 10 LLC

By: _____
Name: VOULLAS 7 BLOUGH
Title: MANAGER

**EXHIBIT B**

EXHIBIT 1

**Wastewater Specifications**

| Wastewater Specifications Composite Baseline totals: | | |
|---|---|---|
| TSS | 79,573 | lbs/month |
| O&G | 45,071 | lbs/month |
| BOD | 759,350 | lbs/month |
| Avg monthly Flow | 36.621 | Million Gallons |

**EXHIBIT B**

Article 1  Definitions And Interpretation .......................................................................1
    Section 1.01.  Definitions ...........................................................................1
    Section 1.02.  Rules of Construction ...........................................................6

Article 2  TERM...........................................................................................7
    Section 2.01.  Initial Term ..........................................................................7
    Section 2.02.  Extension .............................................................................8

Article 3  SALE AND PURCHASE OF WASTEWATER ........................................8
    Section 3.01.  Wastewater Intake ...............................................................8
    Section 3.02.  Condition Precedent ...........................................................8
    Section 3.03.  Observance of Technical Limits, Etc .....................................8
    Section 3.04.  Analysis of Nutrients ...........................................................8

Article 4  REPRESENTATIONS AND WARRANTIES ..........................................9
    Section 4.01.  Operator Representations and Warranties...............................9
    Section 4.02.  Municipality Representations and Warranties ........................9
    Section 4.03.  Owner Representations and Warranties ...............................10

Article 5  INTERCONNECTION AND TRANSMISSION FACILITIES ..................11
    Section 5.01.  Generally ...........................................................................11
    Section 5.02.  Construction of the Interconnection and Transmission Facilities ...........12
    Section 5.03.  Failure to Meet the Interconnection Deadline........................12
    Section 5.04.  Interconnection Equipment on the Facility's Side of the
                Interconnection Point ..........................................................12

Article 6  METERING ..................................................................................12
    Section 6.01.  Generally ...........................................................................12
    Section 6.02.  Installation of the Primary Metering System ........................12
    Section 6.03.  Testing of the Metering Systems ........................................13
    Section 6.04.  Readings ............................................................................13

Article 7  TITLE AND RISK OF LOSS; TAXES .................................................13
    Section 7.01.  Title ..................................................................................13
    Section 7.02.  Taxes .................................................................................13

Article 8  OPERATION OF THE FACILITY .......................................................14
    Section 8.01.  Maintenance Outages..........................................................14
    Section 8.02.  Emergency Outage .............................................................14

Article 9  PAYMENTS ..................................................................................14
    Section 9.01.  Calculation of Payments .....................................................14
    Section 9.02.  Renegotiation of Basic Flow Charge .....................................15
    Section 9.03.  No Set-off; Non-terminability...............................................15
    Section 9.04.  Invoices .............................................................................16
    Section 9.05.  Late Payments ...................................................................16

Article 10  INSURANCE ...............................................................................16
    Section 10.01.  Maintenance of Insurance Policies .....................................16

Article 11  COVENANTS...............................................................................17

**EXHIBIT B**

Section 11.01. Operator Covenants ..................................................................17
Section 11.02. Municipality Covenants ..............................................................18

Article 12 EVENTS OF DEFAULT; REMEDIES ..................................................19

Section 12.01. Operator Events of Default ........................................................19
Section 12.02. Municipality Events of Default....................................................19
Section 12.03. Termination.................................................................................19
Section 12.04. Municipality Step in Rights and Option to Purchase.................20
Section 12.05. Other Remedies .........................................................................21
Section 12.06. Lender Cure Rights.....................................................................21
Section 12.07. Owner Cure Rights .....................................................................22

Article 13 FORCE MAJEURE ............................................................................23

Section 13.01. Definition ....................................................................................23
Section 13.02. Notification Obligations ..............................................................24
Section 13.03. Duty to Mitigate..........................................................................25
Section 13.04. Excuse of Performance...............................................................25

Article 14 DISPUTE RESOLUTION ...................................................................25

Section 14.01. Resolution by the Parties ...........................................................25
Section 14.02. Arbitration ..................................................................................25

Article 15 LIABILITY AND INDEMNIFICATION...................................................26

Section 15.01. Limitation of Liability ..................................................................26
Section 15.02. Indemnification ...........................................................................26
Section 15.03. Defense of Claims ......................................................................27

Article 16 MISCELLANEOUS PROVISIONS.......................................................28

Section 16.01. Notices .......................................................................................28
Section 16.02. Choice of Law.............................................................................30
Section 16.03. Amendments, Etc .......................................................................30
Section 16.04. No Implied Waivers.....................................................................30
Section 16.05. Headings ....................................................................................30
Section 16.06. Third Parties ...............................................................................30
Section 16.07. Relationship of the Parties .........................................................30
Section 16.08. Survival.......................................................................................31
Section 16.09. Integration Clause.......................................................................31
Section 16.10. Assignment.................................................................................31
Section 16.11. Successors and Assigns..............................................................31
Section 16.12. Confidentiality.............................................................................31
Section 16.13. Approval Not to be Unreasonably Withheld or Delayed.....................32
Section 16.14. Environmental Attributes..............................................................32

## EXHIBITS

EXHIBIT 1          Wastewater Specifications Composite Baseline

**EXHIBIT B**